**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**SAT TECHNOLOGY, INC., et al.,**

      **Plaintiffs,**

                           **Case No. 1:18-cv-907**
     **v.**                     **JUDGE DOUGLAS R. COLE**

**CECO ENVIRONMENTAL CORP.,**

      **Defendant.**

<u>**OPINION AND ORDER**</u>

This case arises from a business acquisition gone wrong. Sellers SAT Technology, Inc., Superior Air Treatment Technology, Inc., and Hong-Yang Tseng (collectively Sellers or SAT) sued buyer CECO Environmental Corp. (Buyer or CECO) for breach of contract and related claims. (Compl., Doc. 1). CECO moved for summary judgment on all counts. (Doc. 48). Meanwhile, SAT moved for partial summary judgment on the breach of contract claim (Count One) alone and reserved its arguments on the other counts for trial. (Doc. 50). For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** both motions. Specifically, the Court **GRANTS** SAT's Motion (Doc. 50) and **DENIES** CECO's Motion (Doc. 48) concerning most of Count One, except for a sum of $1,412.83, for which the Court **GRANTS** CECO's Motion and **DENIES** SAT's Motion.[1] The Court also **GRANTS**

---

[1] In SAT's Motion, it requested the following relief for Count One:

- Judgment in favor of Plaintiffs against Defendant for breach of contract in the amount of $398,597.00;

CECO's Motion regarding Counts Two, Three, and Four and thus **DIMISSES** those counts **WITH PREJUDICE**.

## BACKGROUND

On September 26, 2014, SAT and CECO entered into an agreement under which SAT sold a company[2] to CECO. (Doc. 1-2, #15). Four provisions in that agreement are at issue. Each outlines a different mechanism for the parties to make post-closing adjustments to the purchase price.

Such adjustments are typical features of many corporate deals. Sellers often warrant the state of affairs in the corporation they are selling. But buyers understandably can be leery of relying on such promises given they lack sufficient information about the innerworkings of the entity they are buying.

So deals often include trust-but-verify provisions that allow for post-closing adjustments to the purchase price, typically either in the form of "holdbacks" or "earn-outs." A holdback provision allows the buyer to retain part of the purchase price for some time after closing to allow it to test whether the seller's warranties were accurate. If they were not, the buyer keeps some or all of the held-back amount (and

---

- Reasonable attorney's fees and expenses, pursuant to the indemnification provisions of the purchase agreement, in an amount to be established by affidavit of Plaintiffs' counsel; and
- Any other relief this Court deems appropriate.

(Doc. 50, #1590). At oral argument, SAT clarified that it agrees with the Court's reading of the record, explained further below, that there is evidence to support SAT's motion's requested relief save for the $1,412.83 the Court declines to award to SAT. Note that this relief is also less than what SAT originally sought in its complaint. (*See* Doc. 1, #11).

[2] Somewhat confusingly, the acquired company is also denominated SAT Technology, Inc. But unlike the same-named plaintiff in this lawsuit, which is organized in the British Virgin Islands, the acquired company is a Delaware corporation. (Doc. 50, #1581).

may even have a claim against the seller if the shortfall exceeds the holdback). Earn-out provisions, on the other hand, refer to provisions that can adjust the purchase price upward from the agreed amount based on events that occur post-closing. An as-yet-unsold inventory provision offers one common example. More specifically, the parties may agree that the buyer will pay additional amounts to the seller for the products in inventory based on the amount the buyer is actually able to realize based on selling that inventory after acquiring the company. That way the seller can obtain some value for product it expended resources to manufacture but had not yet converted into cash at the time of sale. However, the seller receives that value only in proportion the buyer's ability to generate those revenues.

As a general matter, both holdback and earn-out provisions reduce the risk of the corporate transaction, thereby benefitting both parties. The buyer is willing to pay more because such provisions act as self-correction mechanisms, adjusting the acquired corporation's actual price if the seller has misrepresented the corporation's current state of affairs or likely future performance. And the seller (assuming that its pre-sale representations were truthful) benefits from that higher price when the holdback and earn-out amounts are paid.

As noted, four such provisions in the stock purchase agreement form the core of the dispute here.

**Net Working Capital Adjustment:** First, Section 2.3 of the agreement requires SAT "to leave enough cash" in the company "to cover [its] operating expenses." (Doc. 50, #1582 (citing Doc. 1-2, #31)). The parties sought to accomplish

this objective through a net working capital adjustment provision. (Doc. 1-2, #31–33). The agreement defines "Net Working Capital" as current assets minus current liabilities computed in accordance with generally accepted accounting principles (GAAP). (*Id*. at #27). The parties jointly estimated, pre-closing, that the acquired company's net working capital as of closing would be $300,000. (*Id*. at #24). Section 2.3 then provides a mechanism for the Buyer, post-closing, to determine what the agreement calls the "Actual Closing Date Working Capital." (*Id.* at #31). That is, once CECO had control of the acquired company's books, it had the right to confirm the actual working capital in the acquired company's coffers as of the closing date. CECO retained $100,000 of the purchase price to cover any difference between the pre-closing estimate and the post-closing actual value. (*Id*. at #22, 33). That $100,000 holdback value did not limit the value of the adjustment though. That is, if the actual working capital fell more than $100,000 below the pre-closing estimate, SAT (the seller) would owe CECO (the buyer) a post-closing adjustment (essentially a partial refund of the purchase price) equal to the additional shortfall. Conversely, if the actual working capital was between $0 and $100,000 less than the estimate, CECO would compensate itself for the shortfall using the $100,000 in held-back funds and then owe SAT the remainder. And finally, if the actual working capital exceeded the parties' estimate, then CECO would owe the whole $100,000 holdback plus the amount by which the actual value exceeded the estimate.

The agreement implemented this adjustment calculation through the following steps. First, CECO had ninety days after closing (which occurred on September 26,

2014) to prepare a post-closing net working capital statement and deliver it to SAT. (Doc. 1-2, #31). After receipt, SAT had thirty days to review that statement and tender written objections. (*Id*. at #31–32). If SAT failed to timely object, CECO's tendered statement is to "be deemed to have been accepted by Sellers." (*Id*. at #32). On the other hand, if SAT *did* object, the parties would have thirty days to negotiate in good faith to resolve their differences. (*Id*.). If those negotiations succeeded, the agreement provides that the parties will treat the now-agreed amount as "final and binding." (*Id*.). But if the parties could not resolve the dispute, they were to refer the matter to an independent accountant, who was required to pick an amount "within the range of values" established by CECO's closing statement and SAT's objections. (*Id*.) The accountant's decision would be deemed "conclusive and binding." (*Id*. at #33).

CECO delivered its post-closing net working capital statement on December 24, 2014, the last day of the allowed delivery period. That statement calculated the actual working capital of the purchased corporation to be $213,597—$86,403 shy of the $300,000 estimate specified in the agreement. (Doc. 1-2, #24; Doc. 46-16, #1522). If conclusive, this statement would entitle CECO to keep $86,403 of the $100,000 it held back under the agreement and would require CECO to pay the remaining $13,597 ($100,000-$86,403) to SAT. SAT does not dispute that it never tendered a formal objection to the statement in writing, which means CECO's post-closing statement was "deemed to have been accepted by [SAT]." (Doc. 1-2, #32; SAT Reply, Doc. 56, #1646).

However, events devolved from there. CECO claims it subsequently "discover[ed] issues" with SAT's accounting practices, which affected its calculation of the purchased corporation's working capital. (Doc. 47-1 ¶ 3, #1528). So over the next several months, CECO revised its post-closing statement. (Doc. 43-4, #900). On May 28, 2015, CECO settled on a new calculation of the "Actual Closing Date Working Capital" that was some $692,743 less than the Estimated Working Capital (i.e., the actual working capital as of closing apparently was negative $392,743). (Doc. 47-2, #1532). Using those numbers, CECO claimed in its correspondence with SAT that SAT owed CECO $692,743.[3] (*Id.*). So, based on that calculation, CECO refused to make *any* post-closing adjustment payment to SAT.[4]

**Accounts Receivable Adjustment:** The second provision of the purchase agreement at issue is Section 2.8, which requires CECO to "use reasonable efforts" to collect the acquired company's accounts receivable older than 90 days and to pay SAT

---

[3] It appears CECO did not account for the $100,000 holdback value when it claimed SAT owed this amount. Assuming CECO's calculation were correct, only a $592,743 payment by SAT would be necessary to remedy the $692,743 shortfall because CECO had already withheld $100,000 of the purchase price under the agreement. At oral argument, CECO acknowledged this discrepancy and clarified that the amount SAT owed as a net working capital payment would be offset by the holdback value. (*See* Doc. 47-1 ¶ 8, #1529).

[4] Note that in its briefing and at oral argument, CECO claimed that its final calculation of what it believed SAT owed for the net working capital adjustment payment was $447,022. (Doc. 48, #1544 (citing Doc. 47-1 ¶ 8, #1529)). Unlike the $692,743 value noted above, CECO does not identify evidence in the record showing that this figure was communicated directly to SAT and instead cites its Chief Accounting Officer's affidavit in which he testifies that this was CECO's final valuation of the claimed shortfall. (Doc. 47-1, #1529). Regardless how much CECO claimed it was owed exactly, CECO has made clear that it withheld *any* post-closing adjustment payment to SAT based on the belief that SAT owed such a "substantial" net working capital adjustment payment that "it negate[d]" any other payment CECO was obligated to make under the agreement. (*Id.* ¶ 17, at #1530, Doc. 48, #1545).

any such proceeds collected within 6 months of closing—up to a maximum of $85,000.[5] (Doc. 1-2, #37). As of February 8, 2015, CECO had collected $83,587.17. (Doc. 46-6, #1485). CECO agrees that under Section 2.8, it owes SAT for the accounts receivable collected. (CECO Opp'n, Doc. 54, #1638). But CECO withheld any accounts receivable payment as an offset for the substantial working capital shortfall that, as noted above, CECO claimed SAT owed. (Doc. 47-1, #1529). To support this withholding decision, CECO appears to rely on language in Section 2.3(c)(vi) that allows it to make up for working capital shortfalls by retaining any unpaid portion of the "Earn-Out Amounts" in addition to the "Adjustment Holdback Amount" it had already retained (the $100,000 specified above).[6] (Doc. 1-2, #33; Doc. 54, #1633). The term "Earn-Out Amounts," however, refers to payments arising under Section 2.7 (captioned "Earn-Out")—not Section 2.8, which instead governs the accounts receivable to be collected and which permitted CECO to holdback an additional $85,000 of the purchase price specifically set aside to cover the outstanding accounts receivable that CECO might

---

[5] The purchase agreement capped the amount as follows: CECO would owe no more than $75,000 for those accounts receivable between 90 days and 1 year old and no more than $10,000 for those accounts older than 1 year. (Doc. 1-2, #37).

[6] CECO's briefing also suggests that Section 2.2 permitted CECO to resolve "a[ny] dispute[s] [] as to any component of the Purchase Price … before another component became payable to the other party." (Doc. 48, #1550; Doc. 54, #1634). But Section 2.2 merely defines the Purchase Price and the relevant adjustment values at issue here. (Doc. 1-2, #31). It is wholly unclear what language CECO believes enabled it to condition *any* payment on resolution of such disputes. As a result, it is unsurprising that CECO did not cite Section 2.2 at oral argument to justify its withholding decision. *See infra* note 7.

collect after closing.[7] (*See* Doc. 1-2, #22, 24 (defining "Earn-Out Amounts" according to the meaning set forth in Section 2.7(a))).

---

[7] At oral argument, the Court pressed CECO to identify what provisions of the agreement it believed enabled it to exercise an offset self-help remedy against SAT. Other than Section 2.3(c)(vi) discussed above, CECO identified two: the last clause in Section 2.8, which CECO failed to cite as support for its offset decision in its briefing, and the general indemnification provision found in Section 8.2(a), which CECO raised for the first time in its reply in support of its motion for summary judgment. (Doc. 1-2, #37, 62; CECO Reply, Doc. 57, #1656, 1663). But given these arguments were belatedly raised, the Court need not consider these provisions—CECO has forfeited its ability to rely on them to justify its refusal to pay SAT. *Probst v. Cent. Ohio Youth Ctr.*, 511 F. Supp. 2d 862, 871 (S.D. Ohio 2007) ("It is well established that a moving party may not raise a new issue for the first time in its reply brief or at oral argument.").

Even were these arguments properly raised, neither provision justifies CECO's position. Start with the last clause of Section 2.8: "Buyer shall retain any amounts in the A/R Holdback Amount, if any, that remain following the end of the foregoing 6-month period following the Closing Date regardless of whether amounts in respect of Aged A/R are received by Buyer following the end of such 6-month period." (Doc. 1-2, #37). All this provision says is that CECO does not need to pay SAT for aged accounts receivable collected more than six months after closing—payment is due only for those accounts collected during the six months immediately following closing. (Doc. 46-6, #1485 (showing that CECO understood the provision that way)). Thus, Section 2.8 cannot justify CECO's decision to offset its alleged net working capital deficiency using the accounts receivable payment.

Section 8.2(a) governs SAT's indemnification obligations to CECO under the agreement were SAT to breach any of its obligations—including any breach arising out of its "representation[s] or warrant[es]." (Doc. 1-2, #62). But all this provision states is that CECO "shall be entitled to recover any Losses from either any unpaid Earn-Out Amounts or directly from the Sellers in accordance with this Agreement." (*Id.*). Put another way, the general indemnification provision merely reiterates that CECO may protect itself from any breach by retaining money from the Section 2.7 "Earn-Out" payments—not from the accounts receivable or inventory payments—or by demanding payment for losses "directly *from* the Sellers." (*Id.* (emphasis added)). But that CECO had a right to seek indemnity from SAT for SAT's alleged breach does not mean the agreement granted CECO the right to exercise a *self-help* remedy to offset its losses by withholding other payments it had to make. *Produce Holdings, Inc. v. Benson Hill Fresh, LLC*, No. 2019-0599-JTL, 2020 WL 1188052, at *4 (Del. Ch. Mar. 11, 2020) (distinguishing between indemnification and other self-help remedies and explaining that a buyer in a stock purchase agreement could not argue its non-performance was excused by the seller's alleged "breaches of the representations and warranties" because the buyer had expressly bargained for an indemnification remedy and not "the self-help remedy [it] [ha]d … invoked"); *V&M Aerospace LLC v. V&M Co.*, C.A. No. N18C-09-189 AML CCLD, 2019 WL 3238920, at *5 (Del. Super. Ct. July 18, 2019) ("The offset right is not indemnification. Rather, offset simply affords preliminary relief while the parties resolve their indemnification obligations."). Furthermore, as noted above, CECO actually bargained

The Section 2.7 "Earn-Out" provisions in the purchase agreement permit the seller, SAT, to receive a percentage of the acquired company's EBIDTA[8] for the three fiscal years following closing based on a sliding scale that reflects the acquired company's performance relative to a predetermined target (here, $600,000 of EBITDA). (Doc. 1-2, #33–34). For example, if during the 2015 fiscal year, the company generated $500,000 of EBITDA (i.e., 83.33% of the target EBITDA value), SAT would be entitled to an "Earn-Out" percentage of 55%, which means CECO would owe an "Earn-Out" payment of $275,000 ($500,000*.55) for that fiscal year. (*Id.* at #34).

**Inventory Adjustment:** The third provision at issue is Section 2.9 of the agreement, which requires CECO to "use reasonable efforts to sell" the acquired company's inventory of valves and to give the resulting proceeds, up to a maximum of $300,000, to SAT. (Doc. 1-2, #37). CECO acknowledges that at least $300,000 of inventory was sold. (Doc. 48, #1544). But again, CECO withheld that owing payment as an offset for the amount it claimed SAT was required to pay as a post-closing

---

for specific offset remedies under Section 2.3(c)(vi) of the agreement—CECO had a right to offset its losses, but only against the "Earn-Out" payment under Section 2.7 and the $100,000 holdback amount. (Doc. 1-2, #33). Under hornbook contract law, "[s]pecific language in a contract controls over general language." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). CECO expressly bargained for very specific self-help offset rights, which means the general indemnification provision does not impliedly permit CECO to exercise self-help remedies against its other payment obligations that are not specifically provided for in the agreement. Thus, Section 8.2(a) is of no help to CECO either.

[8] EBITDA is defined as a company's "earnings for [a specified fiscal] period before interest, taxes, depreciation and amortization" and is generally treated as a measure of a company's gross revenue for that fiscal period. (Doc. 1-2, #24).

adjustment to the purchase price for the alleged working capital shortfall noted above.[9] (Doc. 47-1, #1529; Doc. 54, #1630).

**Indemnification Provision:** The final provision of the agreement at issue is Section 8.2(b), which requires CECO to indemnify SAT against any losses SAT suffered from CECO's failure to perform any of its contractual obligations. (Doc. 1-2, #62). Losses include "reasonable attorneys' fees and expenses." (*Id.*). CECO maintains that it fully performed under the contract and is thus not required to indemnify SAT. (Doc. 54, #1634–35).

SAT sued CECO for breach of contract, breach of good faith, fraud, and specific performance and injunctive relief. (Doc. 1). Now, SAT moves for partial summary judgment on only its breach of contract claim. (Doc. 50). Meanwhile, CECO moves for summary judgment on all counts. (Doc. 48). Both motions are ripe for review.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the non-movant bears the burden of proof at trial, as is the case with respect to CECO's motion for summary judgment, the movant can establish that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law by showing that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–

---

[9] At oral argument, CECO admitted that there was no specific provision in Section 2.9 of the purchase agreement permitting it to offset any working capital shortfall by refusing to make the required inventory payment to SAT.

23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). On the other hand, if "the moving party has the [ultimate] burden" of proof at trial, as is the case with respect to SAT's motion for partial summary judgment, its "showing [that there are no genuine disputes of material fact] must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party"—that the undisputed material facts entitle the movant to judgment as a matter of law. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted); *see Celotex Corp.*, 477 U.S. at 323.

But as the Sixth Circuit has explained, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (cleaned up) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)).

In sum, the non-moving party, at this stage, must present some "sufficient disagreement" that would warrant submission of the dispute to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## LAW AND ANALYSIS

CECO, the defendant, moved for summary judgment on the entire Complaint. SAT moved for partial summary judgment in its favor regarding its Count One, while reserving the other counts for trial.[10] So the Court will address all four counts.

### A.    Count One: Breach of Contract.

The agreement specifies that Delaware law applies. (Doc. 1-2, #66). "Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff." *Connelly v. State Farm Mut. Auto. Ins.,* 135 A.3d 1271, 1279 n.28 (Del. 2016) (internal quotation marks omitted) (quoting *H–M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 140 (Del. Ch. 2003)). As described below, there are no genuine disputes of material fact that all three elements are present here (with the caveat that SAT has failed to present evidence to substantiate the full amount of damages it initially claimed—a fact SAT conceded at oral argument). So the Court **GRANTS IN PART** SAT's Motion for Partial Summary Judgment (Doc. 50).

### 1.    Contract

Under Delaware law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently

---

[10] That said, SAT acknowledged at oral argument that Counts Two (Breach of Good Faith), Three (Fraud), and Four (Specific Performance and Injunctive Relief) were ancillary to and largely duplicative of its breach of contract claim found in Count One of the Complaint. And SAT suggested that an award in its favor on Count One would likely be sufficient to resolve its claim against CECO. While mindful of SAT's concessions regarding the counts it had initially reserved for trial, the Court will still address all four counts for the sake of completeness—especially given the parties had fully briefed both pending motions.

definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

The agreement here is a valid contract—at oral argument, no party suggested otherwise. *The parties intended for the agreement to bind them*. (Doc. 1-2, #21). Both parties labored over creating and negotiating the instrument, and both signed it. (Doc. 48, #1558; Doc. 50, #1582–83, 1593; Doc. 54, #1624). *The terms are sufficiently definite*. It is a sophisticated instrument that plans for several scenarios that could arise during and after closing. It defines a laundry list of relevant terms in a glossary. (Doc. 1-2, #21–30). Furthermore, both the document as a whole and the relevant terms seem capable of ready interpretation. *And, of course, there was consideration—* the money, the transfer of stock, and the legal detriments the parties took on as part of the agreement. Moreover, CECO seemingly conceded the agreement's validity in its Motion for Leave to Assert Counterclaim, specifically in its attached proposed counterclaim.[11] (Doc. 23, #258).

**2.  Breaches and damages.**

There are four relevant alleged breaches at issue: CECO's withholding of (1) the post-closing adjustment payment, (2) the accounts receivable payment, (3) the inventory payment, and (4) indemnification of attorneys' fees and expenses.[12]

---

[11] The Court previously denied as untimely and prejudicial CECO's motion to amend its answer to include the proposed counterclaim. (Doc. 51).

[12] The parties dispute whether CECO delivered "Earn-Out" statements to SAT per Section 2.7(e) of the agreement. (Doc. 50, #1585; Doc. 54, #1631). But CECO argues: regardless, SAT admits that the financial statements CECO shared show that CECO does not owe any "Earn-Out" payments under Section 2.7 given it suffered overall losses as a result of its acquisition

### a. Post-closing adjustment payment.

Section 2.3 of the agreement requires CECO to prepare a post-closing net working capital statement within 90 days of the closing date. (Doc. 1-2, #31). CECO did so. Under the agreement, SAT's failure to object to that statement in writing within 30 days means CECO's statement is "deemed to have been accepted by [SAT]." (*Id.* at #32). All agree SAT did not object to CECO's first post-closing net working capital statement in writing by the agreed date. (Doc. 54, #1628; Doc. 56, #1646). Therefore, the statement is deemed "accepted"—in other words, CECO's original statement governs. Under that statement, CECO was entitled to retain $86,403 of the $100,000 it held back from the purchase price. (Doc. 50, #1583). And it owes SAT the remaining $13,597 for this post-closing adjustment. (*Id.*; Doc. 54, #1625).

---

of the company. (Doc. 54, #1626). Although portions of SAT's briefing are ambiguous, in its proposed statement of undisputed facts, SAT does "concede the revenue targets were not achieved to trigger an Earn-Out payment," (Doc. 50-1, ¶ 30, #1596; Doc. 50, #1585–86)—a concession SAT confirmed at oral argument. Not surprisingly, as a result, SAT did not include "Earn-Out" payments in its request for relief on Count One. (Doc. 50, #1582, #1589–90). So consistent with SAT's position in its briefing and at oral argument, the Court deems SAT to have abandoned its claim for "Earn-Out" payments under Section 2.7. Finally, while SAT argues that even if it is not entitled to an "Earn-Out" payment under Section 2.7, "CECO is still in breach of the [Agreement] for failing to deliver the Earn-Out Statements," SAT asks only "for reasonable attorney's fees and expenses" as compensation for "commenc[ing] this litigation" to remedy this alleged breach. (*Id.* at #1586, 1589–90). At oral argument, SAT again confirmed that this accurately reflected its position. And SAT clarified that in its view, CECO's indemnification obligations under Section 8.2(b) would be triggered by its breach of any one of the provisions at issue here—namely, SAT's request for indemnification is not unique to its claim that CECO failed to deliver "Earn-Out" statements. The Court agrees that this is the most sensible reading of Section 8.2(b). And because the Court finds that CECO breached other aspects of the agreement and that SAT is entitled to reasonable fees and expenses for those breaches, *see infra* Section A.2.c, it is therefore unnecessary to resolve whether SAT is correct that CECO failed to perform its contractual obligation to deliver "Earn-Out" statements. As a result, the Court declines to opine on the issue.

CECO disagrees—but only because it contends that SAT's "acceptance" through its failure to timely object did not make CECO's working capital statement "binding." And, because CECO maintains that that statement was not "binding," it believes it could continue to revise the statement based on later-discovered alleged irregularities in the acquired company's books. (Doc. 48, #1542; Doc. 54, #1625).

Where does CECO divine this proposed distinction between "accepted" and "binding"? Presumably the argument proceeds something like this: The agreement provides that if SAT fails properly to object in time, the statement "shall be deemed to have been accepted" by SAT. (Doc 1-2, #32). But if SAT *does* object properly, the parties "shall negotiate in good faith to resolve such objections within thirty (30) days," and if they successfully resolve them, the modified statement "shall be final and binding." (*Id.*). Based on this slight distinction in language, the only way for the statement to become "binding," according to CECO's argument, would be for SAT to initiate the objection process, which it did not do. (Doc. 54, #1628).

That's too cute by half. This strained reading of the agreement tries to create some meaningful distinction between "accepted" and "final and binding" without any support from the text or reason.

Start with plain meaning. "Acceptance" is generally understood in contract law to refer to an act that seals the deal and makes an agreement binding. *See generally* 2 Williston on Contracts § 6:1 (4th ed.). There is no good reason to believe it bears a

15

different meaning when applied to a document due under a contract.[13] Turn to common sense. Under Section 2.3(c)(vi), the Post-Closing Adjustment was to be paid "within five Business Days of *acceptance* of the applicable Closing Working Capital Statement." (Doc. 1-2, #33 (emphasis added)). Why would *acceptance* trigger the payment obligation if "binding" is what really counts as CECO claims in its opposition brief? Beyond that, assuming its interpretation of the agreement were correct, how can CECO, with a straight face, argue that SAT owes it money under its own interpretation of the agreement? As CECO points out, SAT never provided written objections to CECO's revised statement claiming it is owed $692,743 either. (Doc. 54, #1630). Given the objection process was never initiated, how can that statement be "binding"? Under CECO's proposed reading of the contract, it cannot.

Perhaps recognizing the significant difficulty in attempting to drive a textual wedge between the agreement's use of the terms "accepted" and "final and binding," CECO instead focused at oral argument on a contention it raised in its brief opposing SAT's motion—that the parties' "course of performance … evidences their mutual agreement and understanding that continued discussions and negotiations were permitted" by the agreement. (Doc. 54, #1629–30). This alternate argument fares no

---

[13] Presumably, this argument would also require the agreement to state that when SAT failed to object to the statement, the agreement was to "be deemed to have been accepted [*as final and binding*]." (Doc 1-2, #32). But modifiers, like the clause "as final and binding," are not always needed to communicate effectively, especially given "acceptance" renders such clause redundant. Take an analogous example. One who gifts something to a friend need not communicate that the gift is free for the friend to understand that he has received something for which he did not need to pay. In such a case, free is implied by the word gift. Just the same here. Use of the word acceptance naturally implies the parties intended to treat the accepted working capital statement as final and binding.

16

better. Under Delaware law, "[i]n construing an *ambiguous* contractual provision, a court *may* consider evidence … of the parties['] … course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) (emphasis added). *See Pers. Decisions, Inc. v. Bus. Plan. Sys., Inc.*, C.A. No. 3213-VCS, 2008 WL 1932404, at \*5 (Del. Ch. May 5, 2008) ("[*A*]*fter plain meaning*, the most persuasive evidence of the parties' agreement is the course of its performance." (emphasis added)). CECO's attempt to rely on extrinsic evidence in the form of course of performance falters at step one—the lack of an ambiguity in the agreement. The agreement states in no uncertain terms that a tendered working capital statement by CECO to which SAT fails to object "shall be deemed to have been accepted." (Doc 1-2, #32). "Accepted" simply is not ambiguous. CECO disagrees, claiming that ambiguity arises because there is nothing "expressly prohibiting the parties from continuing to engage in discussions and negotiations regarding the [net working capital] calculation" after SAT fails to object. (Doc. 54, #1629). But that assertion does not survive any amount of scrutiny. Even though the agreement does not expressly employ the words 'the parties are barred from revisiting CECO's unobjected to calculation,' that is the (patently) obvious meaning of the agreement's treatment of such calculation as "accepted" by—and therefore binding on—SAT. Thus, CECO's reliance on the parties' course of performance and negotiations following the expiration of SAT's window to object is unavailing. Such evidence cannot create

17

ambiguity where none exists.[14] *Eagle Indus.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence[, like the parties' course of performance,] may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *id.* at 1233 n.11 ("[B]ackward-looking evidence gathered after the time of contracting is not usually helpful" to establish "the parties' intent *at the time they entered into the contract*."). As a result, CECO's attempt to avoid the plain language in the contract is not well taken.

Even more to the point, the entire contractual structure here was directed at resolving the identified post-closing disputes on an expedited—and carefully spelled out—timeframe. As for working capital, CECO had 90 days after closing to calculate it. (Doc 1-2, #31). SAT then had 30 days after receipt to object. (*Id.* at #31–32). The parties then had 30 days to work it out on their own if they could. (*Id.* at #32). After which, an accountant would have 30 days to select a number in the disputed range. (*Id.* at #32–33). It is hard to square that rigidly specified and carefully crafted review and resolution process with CECO's argument that it apparently had some kind of open-ended invitation to continue revisiting its working capital calculations—and not

---

[14] While it would have posed its own problems of proof, CECO perhaps instead could have argued that the parties' course of performance constituted evidence that the parties mutually assented to a *modification* of the terms of the contract. *Cf. Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) (highlighting "Delaware law's aversion to oral modifications of written agreements" and explaining that any such modification requires proof of "the intended change with specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document" (cleaned up)). But CECO neither raised this argument in its briefing nor at oral argument when the Court asked it directly whether it was arguing that there was a modification of the agreement. As a result, the Court declines to evaluate whether the parties' actions were sufficient to modify the plain terms of the agreement.

to resolve the dispute by reducing CECO's demands, but rather to continue to escalate the amount it claimed to be owed.

Importantly, the Court is not saying that CECO erred in its ultimate calculations or that SAT correctly represented the working capital of the acquired company. The Court acknowledges that it is quite possible that CECO's concerns about certain irregularities were warranted, that its later calculations were correct, and that SAT short-changed its buyer. But the relevant point here is that the parties *ex ante* agreed on a specific structure for CECO to test SAT's representations about the acquired company's working capital and to resolve any disputes. CECO availed itself of that contractually specified framework—it delivered a working capital statement to SAT to which SAT failed to object. Thus, CECO received the benefit of its bargain. It is entitled to no more.

Simply, per the plain terms of the agreement, the original unobjected statement, once "accepted," governed. And as such, the parties do not dispute that under that statement, CECO owes SAT $13,597 from the $100,000 Adjustment Holdback Amount.

### b. Accounts receivable payment and inventory payment.

Section 2.8 of the agreement requires CECO to use reasonable efforts to collect the acquired company's accounts receivable older than 90 days and within 6 months, to pay the proceeds collected to SAT, up to $85,000. (Doc. 1-2, #37). And section 2.9 of the agreement requires CECO to use reasonable efforts to sell the acquired company's inventory of valves and to give the proceeds to SAT, up to $300,000. (*Id.*).

CECO admits it collected all of the outstanding, aged accounts receivable—a total of $83,587.17. (Doc. 46-6, #1485; Doc. 50-1 ¶ 23, #1596; Doc. 54, #1625; Doc. 54-1, #1638 (admitting to ¶ 23)). And CECO admits that all the inventory was sold up to $300,000. (Doc. 48, #1544). So under the purchase agreement, it would seem CECO owes SAT the sum of the two—$383,587.17. Both sides, though, raised issues with this.

In its briefing, SAT argued that because CECO admits it collected *all* the accounts receivable, CECO owes the full $85,000. (Doc. 50, #1586 (citing Doc. 46-6, #1485)). But the email SAT cited reveals CECO admitted to collecting only $83,587.17. (*See* Doc. 46-6, #1485). And under the purchase agreement, only that amount is due as a payment to SAT—not $85,000. (Doc. 1-2, #37 ("[CECO] shall distribute to [SAT] portions of the [$85,000 accounts receivable specific] Holdback Amount, if any, *equal to the amounts collected* ...." (emphasis added))). At oral argument, after the Court highlighted this discrepancy and the fact that SAT had not pointed to any other evidence proving that CECO collected aged receivables totaling the full $85,000 maximum listed in the purchase agreement, SAT acknowledged that the undisputed facts proved that it was owed a total of $83,587.17 for the accounts receivable collected.[15] So, in accordance with the evidence in the record and SAT's

---

[15] It is likely that the issue was one of terminology rather than a failure to present evidence. Both SAT and CECO agree that "All the Aged A/R was eventually collected during the six-month period." (Doc. 50-1 ¶ 23, #1596; Doc 54-1, #1638 (admitting to ¶ 23)). It is easy to see how one may have erroneously presumed that "All the Aged A/R [(accounts receivable)]" referred to a sum of accounts totaling to the "A/R Holdback Amount"—$85,000. Certainly, the portion of the accounts receivable holdback amount CECO was to pay SAT depended on what aged accounts were collected. But, importantly, under the agreement, the value of the

position at oral argument, the Court finds that SAT's claim in its briefing to the last $1,412.83 of $85,000 maximum cannot survive summary judgment.

CECO meanwhile disagrees that it owes *anything* for these two amounts—a position it reiterated at oral argument. According to CECO, it is not on the hook for any payment because SAT actually owed CECO a substantial post-closing adjustment payment under the working capital provision that negated any other payments CECO had to make under the agreement. (Doc. 54, #1630). But, as explained above, CECO's revised post-closing adjustment statement and related calculations do not govern. Its original statement and calculations do. Under the binding original statement, *CECO owes* SAT $13,597. So even assuming CECO could apply an offset to its payment obligations under Sections 2.8 and 2.9 (it cannot, *see supra* notes 6–7, 9), CECO may not exercise its right to such an offset here: the factual predicate for the offset (that SAT owes CECO a post-closing working capital adjustment) is missing.

In sum, the undisputed facts prove that SAT is entitled to a $383,587.17 payment from CECO for aged accounts receivable collected and the inventory sold.

### c.    Indemnification.

Section 8.2(b) of the agreement requires CECO to indemnify SAT against any losses it suffered from CECO's failure to perform any of its contractual obligations.

---

aged accounts left over (and collected) need not (and per the undisputed facts here, did not) equal $85,000. (Doc. 1-2, #37 (anticipating that "the amounts collected of Aged A/R" might equal only a "portion[] of the A/R Holdback Amount")). Collection of all the aged accounts simply means CECO collected all accounts that fit the purchase agreement's definition of being older than 90 days. And the undisputed facts in the record reveal that those accounts totaled to a number just shy of $85,000.

(Doc. 1-2, #62). Losses include "reasonable attorneys' fees and expenses." (*Id.*). As explained above, CECO breached the agreement—CECO did not pay SAT the $13,597 from the Adjustment Holdback Amount owed nor the $383,587.17 it owed SAT under the agreement for the aged accounts receivable collected and the inventory sold. SAT incurred attorneys' fees and expenses in trying to recover damages for that breach. So CECO must indemnify SAT for those losses under the agreement.

CECO disagrees once more. But its disagreement is again based on an erroneous impression that it did not breach the agreement. (Doc. 54, #1634–35). Because CECO *did* breach the agreement, it must indemnify SAT against any resulting losses, which include SAT's "reasonable attorneys' fees and expenses."

Consistent with that provision, the Court will provide SAT an opportunity to document the attorneys' fees and expenses to which it believes it is entitled. And it will provide CECO the opportunity to respond.

## B.     Count Two: Breach of Good Faith.

"[I]mposing an obligation on a contracting party through the covenant of good faith and fair dealing is a cautious enterprise and instances should be rare." *Frontier Oil v. Holly Corp.*, No. Civ. A. 20502, 2005 WL 1039027, at *28 (Del. Ch. Apr. 29, 2005) (cleaned up). "[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch.), *aff'd*, 609 A.2d 668 (Del. 1992) (table).

According to SAT, CECO breached an implied duty of good faith by withholding the accounts receivable payment and the inventory payment for what SAT claims was an unreasonable length of time—especially considering the agreement's "time is of the essence" clause. (SAT Opp'n, Doc. 53, #1616). But the agreement expressly dictates how and when the accounts receivable and inventory payments are calculated and delivered. CECO was supposed to make the accounts receivable payments within 6 months. (Doc. 1-2, #37; *see also* Doc. 46-6, #1485 (showing that CECO understood the provision that way)). And CECO was required to "use reasonable efforts to sell the Valve Inventory" and then to distribute the proceeds to SAT. (*Id.*). Though vague, that is an explicitly written standard governing CECO's behavior in making the inventory payments. Given the specificity regarding the timelines for these payments, the "time is of the essence" clause, if anything, is simply another *express* part of the contract that places a blanket duty on CECO—and reiterates what is already clear from the rest of the contract: that CECO was to move quickly. All these provisions make a strong foundation for a breach of contract claim (as explained above). But given the contract is itself comprehensive, the provisions are poor candidates for a breach of good faith claim. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("Existing contract terms control ... such that implied good faith cannot be used to circumvent the parties' bargain ...."). Put another way, there is no additional *implied* duty to be found.[16] Everything is written out.

---

[16] SAT effectively conceded this point at oral argument when it acknowledged that this claim was largely duplicative of its breach of contract claim.

So the Court **GRANTS** CECO's Motion for Summary Judgment (Doc. 48) as to Count Two and **DISMISSES** it **WITH PREJUDICE**.

## C.     **Count Three: Fraud.**

In its briefing and complaint, SAT "alleged that CECO had engaged in fraud by concealment" when it withheld information about the accounts receivable and inventory payments. (Doc. 53, #1617) (citation omitted). Under Delaware law,

> [t]o establish a prima facie case of intentional misrepresentation (fraudulent concealment), the following elements must be proven:
>
> (1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak;
>
> (2) That the defendant acted with scienter;
>
> (3) An intent to induce plaintiff's reliance upon the concealment;
>
> (4) Causation; and
>
> (5) Damages resulting from the concealment.

*Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) (citing *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del. 1983)). And where there is a fiduciary or contractual relationship, there may also be a duty to speak. *Cf. id.* at 150.

SAT cited *Nicolet* to argue that a party can deliberately conceal even with a "single word, even a nod or a wink or a shake of the head or a smile intended to induce another to believe in the existence of a nonexistent fact." (Doc. 53, #1617 (citing *Nicolet*, 525 A.2d at 149)). But to survive summary judgment, SAT must identify some evidence that tends to prove that there is a dispute of material fact as to CECO's purported concealment. SAT offers evidence of neither a word nor a wink. Yes, SAT says CECO offered fraudulent hints and suggestions. (Doc. 53, #1617). But which ones? When? SAT cites nothing and indeed admits that "it is not clear that there was

a wink or a nod asserting any fact."[17] (*Id.*). Instead, the Court is left with just SAT's Complaint, which is not evidence and which is filled with only *allegations* of refusals to speak. (Doc. 1, #9–10).

Even assuming CECO had a duty to speak, SAT points to no evidence that tends to prove CECO acted with knowledge or intent—at oral argument, SAT merely speculated about what the parties might have known at different points in time. Nor does SAT highlight any evidence that it suffered damages caused by those fraudulent hints and suggestions—whatever they may be. Without SAT offering *any* evidence to support the elements of its own claim, Count Three cannot survive summary judgment. So the Court **GRANTS** CECO's Motion for Summary Judgment (Doc. 48) as to Count Three and **DISMISSES** it **WITH PREJUDICE**.

### D.    Count Four: Specific Performance and Injunctive Relief.

"A party is not entitled to specific performance if an award of damages would be as complete, practical, and efficient to the ends of justice and its prompt administration as the equitable remedy … and would be available to the plaintiff as a matter of right." *E. Balt LLC v. E. Balt US, LLC*, C.A. No. 10462-VCN, 2015 WL 3473384, at *2 (Del. Ch. May 28, 2015) (cleaned up).

---

[17] SAT chose instead to defend against CECO's motion for summary judgment by arguing that "[t]here is no evidence *introduced by CECO*" to prove that it did *not* engage in fraud. (Doc. 53, #1617). But SAT misapprehends who bears the overall burden of proof on the fraud claim—SAT, not CECO. CECO is able to meet its burden at summary judgment by showing an absence of evidence to support the elements of SAT's fraud claim. *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020). But SAT can avoid summary judgment on this claim only by affirmatively identifying evidence to support its position. *Id.* SAT's failure to identify such affirmative evidence of fraud means summary judgment is warranted on this count.

In Count Four of its Complaint, SAT asked for specific performance and injunctive relief. Specifically, it asked the Court to

- enjoin CECO from "conduct that would further damage" CECO;
- order CECO "to generate and deliver the Earn-Out Reports";
- and order "[a]n accounting" of CECO and its subsidiaries' finances, "from September 26, 2014 through the date of a final judgment entry in this case."

(Doc. 1, #11–12).

The second request is moot. CECO already provided those reports during litigation. (Doc. 50, #1585). And it is unclear why the first and third are needed. Once SAT receives money damages to which it is entitled, why is any other equitable relief necessary? CECO addresses it briefly. (Doc. 48, #1154–55). But SAT does not address the issue at all. Indeed, at oral argument, SAT acknowledged that this requested relief was largely duplicative of its claim for damages for CECO's breach of contract. As a result, the Court takes SAT to be abandoning this claim. So the Court **GRANTS** CECO's Motion (Doc. 48) as to Count Four and **DISMISSES** it **WITH PREJUDICE**.

## CONCLUSION

For the above reasons, the Court **GRANTS IN PART AND DENIES IN PART** both motions. Specifically, the Court **GRANTS** SAT's Motion (Doc. 50) and **DENIES** CECO's Motion (Doc. 48) concerning most of Count One, except for a sum of $1,412.83, for which the Court **GRANTS** CECO's Motion and **DENIES** SAT's Motion. The Court also **GRANTS** CECO's Motion regarding Counts Two, Three, and Four, and thus **DISMISSES** those counts **WITH PREJUDICE**. **So CECO owes**

SAT **$397,184.17 plus reasonable attorneys' fees and expenses.**[18] The Court

**DIRECTS** the Clerk to enter judgment for that amount against CECO and for SAT

and **TERMINATE** this matter on the Court's docket.


        **SO ORDERED.**


September 19, 2023                                    _____
**DATE**                                               **DOUGLAS R. COLE**
                                                       **UNITED STATES DISTRICT JUDGE**

---

[18] SAT is **DIRECTED** to file a motion for reasonable attorneys' fees and expenses documenting the basis for its claimed award by October 13, 2023. CECO will have twenty-one (21) days from when the motion is filed to file its response.